## J. F. MULLANEY *et al.* v. OLIVER HUMES.

1. CONFLICTING EVIDENCE—*Assumption on Review.* Where there is any conflict in the evidence, the supreme court, in reviewing a judgment, will assume that the evidence supporting the claim of the party for whom the lower court found is true, and that contrary evidence is untrue.

2. JUDGMENT CREDITOR—*Liability.* A judgment creditor, as well as a constable, is liable for exempt property seized and sold on execution by the latter at the instance of the former.

3. REPLEVIN—*Review.* In replevin to recover a gray mare and a sorrel mare, the fact that the record reveals the word "gray" in one place instead of the word "sorrel," will not invalidate the judgment, where the record recites that judgment was rendered for plaintiff for the return of a gray mare and a sorrel mare, or the value thereof.

*Motion for Rehearing.*

THE opinion herein, filed April 9, 1892, contains a sufficient statement of the case.

*W. B. Ham,* for the motion.

*M. C. Reville,* contra.

*Per Curiam:* This case was dismissed by this court on October 10, 1891. (47 Kas. 99; 27 Pac. Rep. 817.) In due time the plaintiffs in error moved for a rehearing, for a reinstatement of the case, and for a decision upon the merits; but a decision upon the merits would not be of any benefit to the plaintiffs in error. It would result in an affirmance of the judgment of the court below. It appears that on September 7, 1888, a judgment was rendered by a justice of the peace of Rooks county in favor of J. F. Mullaney and against Oliver Humes for $7, debt and damages, and for costs of suit $75.95; and immediately afterward the justice of the peace issued an execution on the judgment and placed it in the hands of C. E. Burhans, constable, for collection. Burhans immediately went to the residence of Humes for the purpose of levying upon sufficient of his personal property to satisfy the execution. Humes, at the time, was a married man, and had a wife and two children. He also had 12 head of horses, or, to be more accurate, 12 animals, male, female, old and young, of the horse kind, and also 33 head of neat cattle; but all or very nearly all of this property was mortgaged to secure debts. It does not appear whether Humes had any other property or not. Humes objected to the constable's taking of any of his property. Upon this subject Burhans testified, among other things, as follows:

"Ques. Did you levy that execution on the property of

24 — 48 KAS.

Humes? Ans. I went over there for the property, and he did n't consent to let it go, and I did n't take it that time, and then my wife was sick. I could not leave home; I had Mr. Swan go in my place; deputized him.

"Q. State how you were received when you went to levy that execution? A. He said he would not let any property go.

"Q. Make any threats against you? A. No, sir."

Burhans did not levy upon any of the property, but returned the execution. Afterward, and on September 12, 1888, just five days after the rendition of the judgment, the justice of the peace issued another execution and placed it in the hands of R. W. Swan, as special constable, for the purpose that he might execute the same. Swan went to the residence of Humes, and he testified that he levied upon about 10 horses and about 28 head of neat cattle to satisfy the foregoing execution, and that he left the property in the hands of Humes as his agent to take care of until he should call for it. He testified, among other things, as follows:

"Q. At the time you went and told him you would leave it in his care as your agent? A. He said he would not consent for that property to go.

"Q. You say that you told him that you would leave it there as your agent after you had levied upon it? A. Yes, sir.

"Q. What answer did Humes make about holding the property safely for you? A. He said he would hold the property; in case—I understood in case he did n't file his appeal bond by Monday that I was to come back and he was to satisfy the execution; that is what he told me."

But Humes testified that no such levy was ever made; that he never consented to any such levy, or to any levy, or that he would hold the property for Swan, or that it might ever be sold on execution. Humes testified, among other things, as follows:

"Q. I will get you to state if you did n't turn over the mares and all other property to the constable when he went there. A. No, sir; I never did.

"Q. Did n't you tell the constable that you considered he had levied upon and was then holding these horses; if you

were only allowed you would keep them a day or two more?
A. No, sir, I did n't.

"Q. Did n't you run off the stock after you had agreed
with the constable — after you agreed you would keep it safely
for him? A. I never agreed that I would keep it for him.

"Q. Did n't you run the stock away after the constable
had levied on it and left it in your charge? A. No, sir,
I did n't.

.    .    .    .    .    .    .    .    .    .    .

"A. Yes, sir. The way he came there, the constable
came and wanted it; Mullaney had failed to put up a bond
to secure him — indemnifying bond to take this stock — and
I told the constable I would not let it go; I wanted to know
what kind of bond he put up; he said he did n't know, but I
understood the justice told him the bond was good.

.    .    .    .    .    .    .    .    .    .    .

"Q. When did they do that, before this execution was lev-
ied, or afterward? A. That is what I undertook to tell you;
he came there and said he was going to take the stock and I
would not let him.

"Q. Who did? A. Swan.

"Q. Who is Swan? A. The deputy constable.

"Q. Levied on it? A. No, sir; he never levied on it.

.    .    .    .    .    .    .    .    .    .    .

"Q. Now, Mr. Humes, is n't it a fact Swan had gone
there as constable and levied on this stock and told you he
would hold you responsible for its safe-keeping? A. He
did not. He says, 'Mullaney is trying to bulldoze you right
through.' He says, 'I will not serve any papers on you
at all until the 10 days is up.'"

After Swan was at Humes's residence, Humes sold, subject
to the mortgages, or permitted the mortgagees to take, nearly
all the aforesaid property. When Swan returned to Humes's
residence, as he afterward did, he obtained the possession of two
mares, two cows, and two colts. On the day the property was
to be sold by Swan as constable, Humes appeared, objected to
the sale of the mares and cows for the reason, as he claimed,
that they were exempt from execution, and he warned all per-
sons present not to purchase them. The constable, however,
sold them, and Mullaney, who was the plaintiff in the execu-
tion, and who was present and had knowledge of all the facts,

purchased one of the mares. Humes then commenced this present action, which is replevin, in the district court of Rooks county against both Swan and Mullaney, for the recovery of the two mares and the two cows. The sheriff, however, was unable to obtain the possession of the property by virtue of the writ of replevin, and was therefore unable to deliver the possession of the property to Humes. On the trial, which was before the court without a jury, the findings and judgment were in favor of Humes and against both the defendants, Mullaney and Swan, for a return of the property or its value, to wit, $240, and for costs of suit; and Mullaney and Swan, as plaintiffs in error, bring the case to this court for review.

As the court below found generally in favor of Humes and against the defendants below, we must assume, in all cases where there is any conflict in the evidence, that the evidence tending to support the claim of Humes is true, and that all the evidence upon the other side or against Humes's claim is not true; and viewing the evidence in this light, then certainly nothing happened that would estop Humes from claiming that the property in controversy was exempt; and it was exempt. Taking this view of the evidence, no levy was made upon any of Humes's property until the constable, Swan, finally took the two mares, two cows and two calves into his possession for the purpose of selling the same. And this was probably in fact the only levy that was ever made. We must so consider it, under the evidence and findings. There are many objections that might be urged against the validity of the constable's alleged or supposed levy upon the 8 to 12 horses, and upon the 25 to 33 neat cattle, but it is not necessary to state them. Taking the evidence of Humes as true, the property was certainly exempt from the execution, under the statutes of this state and the decisions of this court. (*Rice* v. *Nolan*, 33 Kas. 28; *Gardner* v. *King*, 37 id. 671.)

Mullaney was the plaintiff in the execution levied upon the property of Humes, and it was at his instance that the execution was issued and levied; and Swan, the constable, was simply his agent in the seizure and sale of the property;

hence Mullaney, as well as Swan, is liable for all the property wrongfully seized and sold. .

It is further claimed that the judgment is for the recovery of two gray mares, when, in fact, there was only one gray mare, and the other was a sorrel mare.    It is true the record by mistake uses the word "gray" in one place where it should have used the word "sorrel;" but yet from the whole of the record it can easily be known what was intended, and the record can easily be corrected by changing the word "gray" into the word "sorrel."    And further, the record shows that at the conclusion of the trial the following proceedings were had, to wit:

"There being no further evidence, the court took the case under advisement; and on the 4th day of December, 1888, the court rendered judgment for plaintiff against both said defendants, for the return of the sorrel mare, or for $125; for the return of the gray mare, or for $85; for the return of the two calves, or for $15 each, and for all costs of this action."

This certainly shows in detail what kind of judgment was rendered by the trial court, and in this the word "gray" was not used where the word "sorrel" was intended, or where the word "sorrel" should have been used.

No material error was committed by the court below, and upon the merits of the case the judgment of the court below should be affirmed.    The motion of the plaintiffs in error will therefore be overruled.